Securities Arbitration Law Group, PLLC
By: Mack Press (NY Bar: 2885424)
1200 G St NW, Suite 800
Washington, DC 20005
(202) 444-4222
mack@arbitrationlawgroup.com
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

─────────────────────────────X

JAMES MAY, ANTHONY MUSTO, PATRICIA
THOMAS, JONATHAN CIANGIULLI, ABBA
KADER, CORY TEREICK, and STANLEY
GRUBER

                    Plaintiffs,

        - Against -

FIRST NATIONAL REALTY PARTNERS    LLC,
FIRST NATIONAL REALTY    ADVISORS LLC,
ANTHONY    GROSSO,    CHRISTOPHER
PALERMO,    JARED   FELDMAN,    ANDREW
DENARDO,    KURT    PADAVANO  ,    BILL
COMEAU,    FRED    BATTISTI,   JR.,   MICHAEL
HAZINSKI,    ANDREA    BOITNOTT,    SAM
COLLIER,    MIKE   LAW,    ANDREA   WHITE,
BRANDYWINE   CROSSING   REALTY   FUND
LLC, CHAMPIONS VILLAGE REALTY FUND
LLC, PREMIER CANTON REALTY FUND LLC,
CROWE'S   CROSSING   REALTY   FUND   LLC,
HV CENTER REALTY FUND LLC, MCALPIN
SQUARE   REALTY   FUND   LLC,   SAND   HILL
PLAZA   REALTY   FUND   LLC,   SOUTHLAND
CROSSINGS REALTY FUND LLC, SS TULSA
CENTER REALTY FUND LLC, SUMMERDALE
PLAZA   REALTY   FUND   LLC,   VILLAGE   AT
PITT    MILLS    REALTY    FUND    LLC,
WESTWOOD   SC   REALTY   FUND   LLC,   PC
CENTER TIC 1 MEMBER LLC, CTS CENTER
REALTY   FUND   LLC,   CS   CENTER   REALTY
FUND LLC, CK CENTER REALTY FUND LLC,
TROPICANA   CENTRE   LV   REALTY   FUND
LLC, MCALPIN SQUARE TIC 5 LLC, MAPLE
PARK SC TIC 12 MEMBER LLC, TANNEHILL
TIC 5 LLC, AND JOHN DOES 1-50,

                    Defendants.

─────────────────────────────X

Index No _____

**JURY TRIAL DEMANDED**

JAMES MAY ("May"), ANTHONY MUSTO ("Musto"), PATRICIA THOMAS ("Thomas"), JONATHAN CIANGIULLI ("Ciangiulli"), ABBA KADER ("Kader"), CORY TEREICK ("Tereick"), and STANLEY GRUBER ("Gruber") (collectively, "Plaintiffs"), by and through their attorneys, bring this action against ANTHONY GROSSO, CHRISTOPHER PALERMO, JARED FELDMAN, ANDREW DENARDO, KURT PADAVANO, BILL COMEAU, FRED BATTISTI, JR., MICHAEL HAZINSKI, ANDREA BOITNOTT, SAM COLLIER, MIKE LAW, ANDREA WHITE, JOHN DOES 1-50 (the "RICO Defendants" or "Individual Defendants"), FIRST NATIONAL REALTY PARTNERS LLC, FIRST NATIONAL REALTY ADVISORS, LLC, BRANDYWINE CROSSING REALTY FUND LLC, CHAMPIONS VILLAGE REALTY FUND LLC, PREMIER CANTON REALTY FUND LLC, CROWE'S CROSSING REALTY FUND LLC, HV CENTER REALTY FUND LLC, MCALPIN SQUARE REALTY FUND LLC, SAND HILL PLAZA REALTY FUND LLC, SOUTHLAND CROSSINGS REALTY FUND LLC, SS TULSA CENTER REALTY FUND LLC, SUMMERDALE PLAZA REALTY FUND LLC, VILLAGE AT PITT MILLS REALTY FUND LLC, WESTWOOD SC REALTY FUND LLC, CTS CENTER REALTY FUND LLC, CS CENTER REALTY FUND LLC, CK CENTER REALTY FUND LLC, TROPICANA CENTRE LV REALTY FUND LLC, MCALPIN SQUARE TIC 5 LLC, MAPLE PARK SC TIC 12 MEMBER LLC, TANNEHILL TIC 5 LLC (collectively, "Defendants")[1], and respectfully allege as follows:

## NATURE OF THE CASE

1.      This action is brought pursuant to the Racketeer Influenced and Corrupt Organizations

---

[1] RICO Defendants Anthony Grosso and Christopher Palermo own Defendant FNRP.  RICO Defendants Jared Feldman, Andrew Denardo, Kurt Padavano, Bill Comeau, Fred Battist, Michael Hazinski, Andrea Boinett, Sam Collier, Mike Law, and Andrea White are the executive team for Defendant FNRP.  Defendant FNRP owns all of the other corporate Defendants. Defendant FNRA is the asset manager for the companies.

1

Act, 18 U.S.C. §§ 1961-1968 ("RICO")[2], New York General Business Law § 349 ("NYGBL § 349") and other referenced law, against the Defendants named herein, for Defendants' wrongful and unlawful conspiracy, ponzi scheme, and systematic pattern of deception and fraud in connection with Defendants' marketing and sale to Plaintiffs of shares in Defendants' various LLCs (the "Defendant LLCs"),[3] which purchased large-scale commercial properties for investment (the "Underlying Properties").

2.  Defendants' conspiracy to defraud Plaintiffs with respect to their investments in the Defendant LLCs permeated every aspect of Defendants' interactions and business dealings with Plaintiffs, as well as the financials for the Underlying Properties and the Defendant LLCs. From the start, Defendants employed sophisticated, unconscionable, and abusive phone-tactics that preyed upon investors seeking investment returns, like Plaintiffs.

3.  Defendants, upon information and belief, then maliciously and willfully conspired to defraud Plaintiffs and violate RICO, NYGBL § 349, and Securities and Exchange Commission ("SEC") Regulations by, amongst the plethora of other reasons discussed herein:

(i) **paying illegal commissions to their salespersons** in violation of SEC

---

[2] Defendants are included in this action independently and as RICO Association-In-Fact Enterprises. See 18 U.S.C. §§ 1961-1968.

[3] The LLCs for which Defendants sold shares in to Plaintiffs included:

> Brandywine Crossing Realty Fund LLC, McAlpin Square Realty Fund LLC, Sand Hill Plaza SC Realty Fund LLC, HV Center Realty Fund, Village at Pitt Mills Realty Fund LLC, Crowe's Crossing Realty Fund LLC, Summerdale Plaza Realty Fund LLC, Southland Crossings Realty Fund LLC, SS Tulsa Center Realty Fund LLC, Westwood SC Realty Fund LLC, Champions Village Realty Fund LLC,  PC Center TIC 1 Member LLC, CS Center Realty Fund LLC, CK Center Realty Fund LLC, and Tropicana Centre LV Realty Fund LLC, CS Center Realty Fund LLC, CK Center Realty Fund LLC, Tropicana Centre LV Realty Fund LLC, McAlpin Square TIC 5 LLC, Tannehill TIC 5 LLC, and Maple Park SC TIC 12 Member LLC (collectively, the "Defendant LLCs").

Regulation D;[4]

(ii) **overvaluing the Underlying Properties** in order to fraudulently abscond with the difference in price between the amount that Plaintiffs invested in each Underlying Property and the lesser price Defendants actually paid for each Underlying Property;

(iii) **making unauthorized transfers and distributions** to themselves and companies they own and **commingled funds,** and using other related-entities to **siphon funds from the Underlying Properties**;

(iv) **executing of a ponzi scheme** to pay Plaintiffs false "distributions" by acquiring debt and feigning initial profits on the Underlying Properties; and

(v) **fraudulently skimming from Plaintiffs <u>more than half</u> of the returns from the Underlying Properties** by falsely holding out to Plaintiffs that Defendants were buying the Underlying Properties at below market prices – which was false.

<u>See</u> Dr. Craig McCann, SLCG Economic Consulting: *First Realty Partners Reg D Offerings: Muppets Do Commercial Real Estate* at 3-4  *(the "Dr. McCann Article")* (attached hereto as Exhibit 1, with the *Curriculum Vitae* of Dr. McCann) (showing an example Defendants scheme and Cash Distributions Chart concerning Defendants' purchase of and financial accounting for Defendant LLC –*Maple Park SC Realty Fund LLC* ("Maple Park") – and concluding that "**FNRP is not buying these properties at below market prices as it claims. FNRP buys a property at or above market and shaves more than half of the returns for itself**.") <u>Contra</u> RICO *FNRP's Marketing and Sales Materials*, https://fnrpusa.com/fnrp360/ (FNRP video where Defendants falsely state that Defendants "secure properties both on-market and off-market, at or below market value . . . ); <u>infra</u>.[5]

---

[4] Defendants violated SEC Reg D  by selling private placement securities without a broker-dealer license while paying Defendants' employees and salespersons *transaction-based compensation*, and also by trying to circumvent SEC Reg D and illegally paying Defendants' employees and salespersons  *transaction-based compensation* under the guise of a bonus pool.

[5] Several of the Plaintiffs herein were sold by Defendants shares in the Maple Park investment.

4.    Defendants continued to fraudulently induce Plaintiffs to make their investments in the Defendant LLCs <u>by conspiring to fraudulently *misrepresent* to Plaintiffs that</u>:

    (a)    Defendants had completed all of their *due diligence* respecting their purchases of the Underlying Properties;

    (b)    the Underlying Properties required no significant, material improvements before they could be occupied for profit and resold by Defendants (with a significant payout to Plaintiffs);[6]

    (c)    Plaintiffs would receive consistent, *blended investment-returns* from the Defendant LLCs of up to *9%* annually;[7] and

    (d)    Defendants had used ***fixed***-interest financing to purchase the *Underlying Properties*.[8]

5.    In reality and unbeknownst to Plaintiffs, Defendants were able to make each of the Underlying Properties *appear* like a profitable investment because <u>Defendants had defrauded Plaintiffs and covertly financed the Underlying Properties with **variable** interest-rate loans</u>. And when the market turned and interest rates rose, because Defendants conspired to deceive Plaintiffs and failed to leverage the Underlying Properties with the *fixed*-interest financing as agreed, the properties were significantly overvalued, and Plaintiffs were left with shares in companies that did not – *and could not* – produce proper distributions to Plaintiffs, or be sold for profit.[9]

---

[6] Defendants also deceived Plaintiffs and other investors in a video on their company website describing the due diligence that Defendants' supposedly perform on every investment deal, where RICO-Defendant FNRP falsely claimed that, before every purchase of an investment property by Defendants: "*we have a Strike Force . . .[and] we turn over every stone we can prior to closing on an asset to make sure there are no surprises once we close.*" See https://fnrpusa.com/fnrp360/

[7] <u>See</u> Exhibit 2 (screenshots of financials sent to Plaintiffs from Defendants guaranteeing annual returns of more than 9% for Defendant LLC investments).

[8] Defendants have attempted to hide their conspiracy to defraud Plaintiffs by, amongst the other ways discussed herein, using a program called "*Deal Room*," which enabled Defendants to make presentations to Plaintiffs regarding the Defendants-LLC investments, and then covertly take-back all of the documents they produced in those presentations. <u>See</u> infra.

[9] It makes no logical or business sense for Defendants to have used variable rates to finance the Underlying Properties. Interest rates at the time were as low as they have ever been, so Defendants had no good faith basis or business justification for having financed the Underlying Properties, at the time they did, using variable-rate loans (let alone intentionally withholding that information from Plaintiffs).

6.    For instance, approximately two to three years ago, <u>Defendants purchased the Underlying Property – *Summerdale Plaza Realty Fund LLC*</u> ("Summerdale Plaza") <u>for approximately **$35 Million**</u>, and Defendants sold shares to Plaintiffs and other investors in *Summerdale Plaza*. Repeatedly, Defendants touted to Plaintiffs and other investors that the *Summerdale Plaza* investment was a stabilized, extremely conservative investment.  On February 6, 2025, however, Plaintiffs were informed that <u>Defendants sold *Summerdale Plaza* for approximately **$15 Million** – a loss for Plaintiffs of approximately 60% on their investments in *Summerdale Plaza*</u>, which is unheard of.[10]

7.    In addition, Defendants conspired to defraud Plaintiffs regarding their purchases of shares in the Defendant LLC by covertly, altering material terms in the purchase documents respecting the Underlying Properties (the "Purchase Documents"),[11] without Plaintiffs' knowledge or informed consent, including: (i) <u>Defendants' fraudulent allocation to Plaintiffs with incorrect, decreased fractional-ownership in the Defendant LLCs</u>; and (ii) <u>Defendants' fraudulent imposition to Plaintiffs of fraudulent acquisition-fees on every Defendant-LLC investment</u> – which allowed Defendants to wrongfully collect millions of dollars in fraudulent fees.[12]

8.    To further help accomplish their scheme, Defendants unilaterally designated themselves as the asset manager for the Defendant LLCs (the "Asset Manager"), and also as the sole realtor respecting commercial-tenant deals in the Underlying Properties (the "Sole Realtor"). Then,

---

[10] Plaintiffs will seek discovery in this case to determine how Defendants' could allow such a massive loss to possibly occur with respect to an investment that Defendants purported to Plaintiffs was a "*stabilized, extremely-conservative investment.*"

[11] The Purchase Documents were drafted by Defendants and consist of many thousands of pages.

[12] Defendants accomplished this misconduct by, amongst other devious methods, described herein: (i) using high-pressure, fraudulent and abusive marketing and sales tactics; (ii) fraudulently and repeatedly holding out to Plaintiffs that, if Plaintiffs desired, they could each "cash out" of the Defendant LLC investment-deals at any time, which was not true; (iii) failing to honor agreements with Plaintiffs for reduced management fees; and (iv) intentionally failing to provide Plaintiffs with final copies of the Purchase Documents with enough time for Plaintiffs' attorneys to properly review the Purchase Documents, or Plaintiffs file their 1031 property-exchange tax documents. See *infra.*

Defendants conspired to fraudulently and secretly include provisions in the Purchase Documents that blocked Plaintiffs' right to remove Defendants from those posts. Thus, Defendants were able to continue their wrongful conspiracy – unfettered – and further defraud Plaintiffs and deplete the assets of the Defendant LLCs.[13]

9.     With Defendants now holding this self-imposed, "Golden Ticket" as the <u>Asset Manager,</u> the <u>Sole Realtor,</u> and <u>Owner</u> of the Defendant LLCs (a textbook conflict-of-interest), Defendants conspired to fraudulently manage the Underlying Properties, which enabled Defendants to wrongfully collect from Plaintiffs and the Defendant LLCs: (a) millions of dollars in fraudulent fees and other charges – disguised as payments for services to various Defendant-owned companies; and (b) unreasonable, self-serving commissions and tenant-lease fees and costs.[14]

10.    For instance, Defendants conspired to secretly form a construction arm of their business (under the guise of being separate from Defendants) where, even though Defendants supposedly completed all of their "due diligence" prior to purchasing the Underlying Properties, Defendants' conspired to fraudulently charge the Defendant LLCs millions of dollars for excessive and unreasonable construction-work and material improvements on the Underlying Properties – which significantly depleted the assets of the Defendant LLCs and Plaintiffs' investments and

---

[13] Pursuant to the provisions of the Purchase Documents, removal of Defendant FNRA as the Asset Manager requires unanimous consent of every Defendant LLCs.  To block Plaintiffs and the other investors from being able to accomplish this, Defendants secretly paid $1 to make themselves a voting LLC.  With Defendants as a voting LLC, unanimous consent to remove Defendant FNRA as the Asset Manager of the Defendant LLCs became impossible for Plaintiffs.

[14] One egregious example of Defendants entering into a self-serving tenant-lease deal is the 2024 lease agreement between Defendant Maple Park Place LLC and tenant Five Below, which Defendants executed and from which Defendants earned substantial commissions and fees. Plaintiffs believe that discovery will show considerable other ways that Defendants wrongly collected fees from the Underlying Properties and conspired to defraud Plaintiffs, including Defendants setting up and using other related entities to wrongfully collect fees from the Underlying Properties and the Defendant LLCs. See <u>infra</u>.

distributions.[15]

11.    Moreover, Defendants breached the *Asset Management Agreement* ("AMA") that they were bound by as the Asset Manager by, amongst other ways: (1) making it their policy of refusing to provide to Plaintiffs any documents related to, or the list of other investors in, the Underlying Properties and the Defendant LLCs, as required by the AMA;  (2) failing to send to Plaintiffs, for review and/or approval, regular Reports, Budgets and Notifications for the Defendant LLCs and the Underlying Properties, as required by the AMA; and (3) also failing to notify or gain approval from Plaintiffs for Defendants' material expenditures outside those contemplated in the Defendant-LLC operating agreements,  as required by the AMA.

12.    Defendants' deceptive and fraudulent misconduct in this case, abusive methods of solicitation, and misrepresentations and omissions of material facts with respect to Defendants' wrongful conspiracy to market and sell to Plaintiffs shares in the Defendant LLCs and to manage the Underlying Properties, as described herein, violate RICO, and also constitute deceptive and unlawful acts and commercial practices in violation of NYGBL § 349, and the other laws referenced herein. Each separate sale, commission earned, misrepresentation, and/or illegal act by Defendants constitutes a separate violation under NYGBL § 349.

13.    By way of this action, pursuant to RICO, NYGBL § 349, and other applicable law, Plaintiffs seek to: (i) rescind their investments in the various Defendant LLCs that the Defendants conspired to unlawfully market and sell to Plaintiffs; (ii) force Defendants to disgorge all monies wrongfully collected from Plaintiffs in this case, including: (a) the amounts that Plaintiffs

---

[15] In this regard, Defendants either: (a) fraudulently held out to Plaintiffs – at the time of Plaintiffs' investments – that Defendants had completed all of their due diligence respecting their purchase of the Underlying Properties (and that the Underlying Properties were in good, working order) or (b) fraudulently held out to Plaintiffs – after Plaintiffs' made their investments in the Defendant LLCs – that Defendants' construction company was required to charge the Underlying Properties and Plaintiffs millions of dollars to work on multiple, material improvements for the the Underlying Properties.

invested in the Defendant LLCs, (b) the investment returns that Plaintiffs' were guaranteed by Defendants to receive from their Defendant-LLC investments, and (c) all acquisition and other fees, and commissions, wrongfully collected by Defendants; (iii) pursuant to NYGBL § 349 have the Court enjoin Defendants from continuing their unlawful and deceptive acts and practices described herein; and (iv) recover actual damages in the amount of at least **$12,283,804.00**, plus *automatic* treble damages under 18 U.S.C. § 1964(c), *triple actual-damages* under NYGBL § 349, consequential damages, exemplary damages, pre- and post-judgment interest, attorneys' fees, litigation expenses, and costs of suit.

14.     Because Defendants' illegal conspiracy to defraud Plaintiffs was committed by Defendants in this case with willful and malicious intent to injure and damage Plaintiffs, and with reckless disregard for Plaintiffs' legal rights, and because Defendants' wrongful conspiracy allowed Defendants to siphon tens of millions of dollars from Plaintiffs and the Defendant LLCs, Plaintiffs also seek an award of punitive damages and triple actual-damages pursuant to NYGBL § 349(h).

## JURISDICTION AND VENUE

15.     This Court has original subject-matter jurisdiction over the RICO claims pursuant to 29 U.S C. §1331, 18 U.S.C. §1964, and 18 U.S.C. §§1961 et seq.

16.     This Court additionally has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because at least one Plaintiff resides in a different state than Defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs. In addition, this Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) as those claims are so related to the federal claims in this action that they form part of the same case or controversy.

17.     Venue is proper in the United States District Court for the Eastern District of New York pursuant to 28 U.S.C § 1391(a) because at all relevant times at least one Defendant resided, were found, had agents, and/or conducted business in this District. In addition, at all relevant times, Defendants maintained a corporate office in this District, and Defendants' investor-relations team and other sales, marketing, and/or advertising departments employees were employed and worked in this District. In addition, Defendants' sales strategy, advertising, marketing and promotion was conceived, and emanated, in substantial part from Defendants' offices in this District, and the Defendant LLCs were presented for sale to residents of this District, including several Plaintiffs. Further, Defendants' own and manage many commercial properties in this District. Moreover, a substantial part of Defendants' wrongful and unlawful acts and omissions to Plaintiffs occurred in this District.

## **PARTIES**

18.     PLAINTIFF JAMES MAY is a resident of Quincy, Illinois. The plaintiff invested $7,064,000.00 in the Defendant LLCs (see infra, Chart showing Plaintiffs' investments in Defendant LLCs).

19.     PLAINTIFF ANTHONY MUSTO is a resident of Hewlett Harbor, New York. The plaintiff invested $3,200,000.00 in the Defendant LLCs (see infra, Chart showing Plaintiffs' investments in Defendant LLCs).

20.     PLAINTIFF PATRICIA THOMAS is a resident of San Diego, California. The plaintiff invested $409,804.00 in the Defendant LLCs (see infra, Chart showing Plaintiffs' investments in Defendant LLCs).

21.     PLAINTIFF JONATHAN CIANGIULLI is a resident of Freeport, New York. The plaintiff

invested $60,000.00 in the Defendant LLCs (see infra, Chart showing Plaintiffs' investments in Defendant LLCs).

22.    PLAINTIFF CORY TEREICK is a resident of Gilbert, Arizona. The plaintiff invested $500,000.00 in Defendant LLCs (see infra, Chart showing Plaintiffs' investments in Defendant LLCs).

23.    PLAINTIFF ABBA KADER is a resident of Laguna Niguel, California. The plaintiff invested $800,000.00 in Defendant LLCs (see infra, Chart showing Plaintiffs' investments in Defendant LLCs).

24.    PLAINTIFF STANLEY GRUBER is a resident of Delray Beach, Florida. The plaintiff invested $250,000.00 in Defendant LLCs (see infra, Chart showing Plaintiffs' investments in Defendant LLCs).

25.    Defendant FIRST NATIONAL REALTY PARTNERS LLC ("FNRP") owns the other Defendant LLCs and is a privately-held corporation with over $2 billion in assets, organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

26.    Defendant FIRST NATIONAL REALTY ADVISORS LLC ("FNRA") is the asset manager for the (FNRP-owned) Defendant LLCs, and is a privately-held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

27.    RICO Defendant Anthony Grosso is the owner, managing member, and head decision maker for Defendant FNRP and Defendant FNRA; he completely dominates Defendant FNRP

and FNRA; he uses the corporate form for FNRP and FNRA as alter-egos and as mere tools and/or business conduits; and, upon information and belief, Defendant Grosso has commingled funds and made unauthorized transfers to and from the Defendant-companies named herein. Upon information and belief, Defendant Grosso is a resident of the State of New Jersey. Moreover, he is a RICO conspirator in this lawsuit (along with RICO Defendant Palermo and other yet unnamed employees of Defendants FNRP and FNRA,[16] and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.

28.    RICO Defendant Christopher Palermo is the owner, managing member, and head decision maker for Defendant FNRP and Defendant FNRA; he completely dominates Defendant FNRP and FNRA; he uses the corporate form for FNRP and FNRA as alter-egos and as mere tools and/or business conduits and, upon information and belief, Defendant Palermo has commingled funds and made unauthorized transfers to and from the Defendant-companies named herein. Upon information and belief, Defendant Palermo is a resident of the State of New Jersey. Moreover, he is a RICO conspirator in this lawsuit (along with RICO Defendant Grosso and other yet unnamed employees of Defendants FNRP and FNRA, and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.

29.    RICO Defendant Jared Feldman is the Executive Chairman of Defendant FNRP. He is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet

---

[16]  The other yet unnamed employees of and/or RICO co-conspirators with Defendants FNRP and FNRA have been captioned, "John Does 1-50."

unnamed employees of Defendants FNRP and FNRA, captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.

30.    RICO Defendant Andrew DeNardo is the President – Head of Investor Relations – of Defendant FNRP.    He is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet unnamed employees of Defendants FNRP and FNRA, captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.

31.    RICO Defendant Kurt Padavano is the Chief Operating Officer of Defendant FNRP.    He is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet unnamed employees of Defendants FNRP and FNRA, captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.

32.    RICO Defendant Bill Comeau is the Chief Financial Officer of Defendant FNRP.    He is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet unnamed employees of Defendants FNRP and FNRA, captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with

respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.

33. RICO Defendant Fred Battisti is the Chief Revenue Officer of Defendant FNRP. He is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet unnamed employees of Defendants FNRP and FNRA, captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.

34. RICO Defendant Michael Hazinski is the Chief Investment Officer of Defendant FNRP. He is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet unnamed employees of Defendants FNRP and FNRA, captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.

35. RICO Defendant Andrea Boitnott is the Director of Property Management of Defendant FNRP. She is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet unnamed employees of Defendants FNRP and FNRA, captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs.

36. RICO Defendant Sam Collier is the Executive Vice President, Leasing – Anchors and Accounts of Defendant FNRP. He is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet unnamed employees of Defendants FNRP and FNRA,

captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs

37.     RICO Defendant Mike Law is the Senior Vice President of Marketing of Defendant FNRP. He is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet unnamed employees of Defendants FNRP and FNRA, captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs

38.     RICO Defendant Andrea White is the Director of Underwriting of Defendant FNRP.  She is a RICO conspirator in this lawsuit (along with the other RICO Defendants named herein, other yet unnamed employees of Defendants FNRP and FNRA, captioned as "John Does 1-50," and the RICO Enterprises Defendant FNRP and Defendant FNRA) in connection with Defendants' conspiracy to defraud Plaintiffs and systematic pattern of deception and misrepresentation with respect to Defendants sale to Plaintiffs of shares in Defendant LLCs

39.     Defendant BRANDYWINE CROSSING REALTY FUND LLC is a privately-held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

40.     Defendant CHAMPIONS VILLAGE REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

14

41.    Defendant CROWE'S CROSSING REALTY FUND LLC is a privately-held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

42.    Defendant HV CENTER REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

43.    Defendant MCALPIN SQUARE REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

44.    Defendant SAND HILL PLAZA REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

45.    Defendant SOUTHLAND CROSSINGS REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

46.    Defendant SS TULSA CENTER REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

47.    Defendant SUMMERDALE PLAZA REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

48.    Defendant VILLAGE AT PITT MILLS REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

49.    Defendant WESTWOOD SC REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

Defendant PC CENTER TIC 1 MEMBER LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

50.    Defendant CS CENTER REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

51.    Defendant CK CENTER REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

52.    Defendant TROPICANA CENTRE LV REALTY FUND LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

53.    Defendant MCALPIN SQUARE TIC 5 LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

54.    Defendant MAPLE PARK SC TIC 12 MEMBER LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

55.    Defendant TANNEHILL TIC 5 LLC is a privately held corporation organized under the laws of the State of Delaware, with its principal place of business located in Red Bank, New Jersey. It can be served through the Delaware Secretary of State.

**Application of New York law To The Facts of This Lawsuit Is Appropriate**

56.    Application of New York law to this lawsuit is appropriate because Defendants are have a corporate office and have a substantial presence in New York and/or maintain some or all of their customer relations, sales, marketing and/or advertising department(s) in New York, where a substantial part of the alleged conspiracy and egregious misconduct by Defendants, described herein, emanated from. In addition, Defendants' sales strategy, advertising, marketing and promotion was conceived, and emanated in substantial part, from Defendants' offices in New York.   Further, Defendant LLCs were presented for sale to residents of New York. Further, Defendants own and manage many commercial properties in New York.

57.    New York also has a substantial, compelling reason to protect consumers from deceptive and unlawful misconduct of companies with corporate offices and a substantial presence there, and who regularly sell services and products in and/or from New York and to New York residents, such as Plaintiffs.

**FACTS**

58.    Defendant FNRP is a significant investment company (with over $2 Billion in reported assets), that uses capital from investors to purchase commercial real-estate properties for

investment. Plaintiffs are private investors that purchased from Defendants shares in various Limited Liability Companies ("LLC"), which Defendants conspired to fraudulently market and sell to Plaintiffs (and which are the basis for this lawsuit) (the "Defendant LLCs").[17] Throughout 2022 and 2023, Defendants offered to Plaintiffs and other investors shares in the Defendant LLCs.

59.    From the start, Defendants conspired to engage in a systematic pattern of deception and fraud with respect to Plaintiffs' investments in the Defendant LLCs, which permeated every aspect of Defendants' interactions and business dealings with Plaintiffs (as well as the financials for the Underlying Properties and the Defendant LLCs), and which allowed Defendants to wrongfully collect more than $12 Million from Plaintiffs.[18]

60.    Defendants initially employed sophisticated, abusive phone-tactics, and ran a masterful – but fraudulent – sales-and-telemarketing operation, that preyed upon investors seeking investment returns, like Plaintiffs. Defendants personally and through various employees/sales agents made (and continue to make) thousands of intrastate and interstate telephonic sales calls per month, and contacted potential investors throughout the country.[19]

61.    Defendants then, upon information and belief, conspired to falsely overvalue the Underlying Properties so that Defendants could unlawfully and fraudulently abscond with the difference in price between the amount that Plaintiffs invested in each Underlying Property and the lesser price Defendants actually paid for each Underlying Property. Upon information and

---

[17] See supra note 3 (listing the Defendant LLCs).

[18] Plaintiffs have alleged herein that Defendants' have conspired to commit against Plaintiffs fraudulent inducement; fraud in preparing the Agreements and financials concerning the Underlying Properties and the Defendant LLCs; and fraud by Defendants in managing and being the Sole Realtor for the Underlying Properties. See infra.

[19] Defendants' conspiracy to use unscrupulous and manipulative sales and marketing techniques convinced each Plaintiff (and other investors) to invest in the Defendant LLCs, by providing Plaintiffs with fraudulent and deceptive information, and collecting the investment funds from Plaintiffs via the U.S. Mail and/or intrastate and interstate wire transfers.

belief, one egregious example where Defendants used their scheme and conspired to substantially overvalue the Underlying Property, and wrongfully collect from that property significant funds, was an investment that Defendants sold to investors, named: _Waldorf Plaza_.[20]

62.    Incredibly, Defendants also conspired to defraud Plaintiffs by falsely holding out to Plaintiffs that Defendants were buying the Underlying Properties at below market prices – which was false – and then fraudulently skimming from Plaintiffs **more than half** of the returns from the investment-properties they buy. See Dr. McCann Article at 3 (attached hereto as Exhibit 1, with the _Curriculum Vitae_ of Dr. McCann ) (showing an example Defendants scheme and Cash Distributions Chart concerning Defendants' purchase of and financial accounting for Defendant LLC –_Maple Park SC Realty Fund LLC_ ("Maple Park") – and concluding that "FNRP is not buying these properties at below market prices as it claims. FNRP buys a property at or above market and shaves more than half of the returns for itself.")

63.    Moreover, Defendants violated Securities and Exchange Commission Regulation D by marketing and selling shares in the Defendant LLCs to Plaintiffs and other investors (i.e., private placement securities), while paying illegal transaction-based compensation to their salespersons without a broker-dealer license, and also by Defendants paying their salespersons transaction-based compensation under the guise of a bonus pool.[21]

64.    In presenting the investments in the Defendant LLCs to Plaintiffs, Defendants falsely held out that Defendants had completed all of their required due diligence before purchasing each of the underlying investment properties (and that of Underlying Properties required virtually no

---

[20]  Plaintiffs will seek in discovery information and financials respecting the _Waldorf Plaza_ deal that Defendants' conspired to severely overvalue.

[21] Defendants' unlawful violation of SEC Reg D in this case is also a violation of NYGBL § 349.

material improvements before they could be occupied for profit and re-sold by Defendants in the near future).

65.    In actuality, conspired to form a construction arm of their business (under the guise of being separate from Defendants) where Defendants conspired to significantly deplete the assets of the Defendant LLCs and Plaintiffs' investments and distributions – by feigning material improvements and, upon information and belief, collecting millions of dollars for fraudulent construction-work to the Underlying Properties.[22]

66.    In fact, RICO-Defendant FNRP falsely stated in a video on their company website that, before every purchase of an investment property by Defendants: "*we have a Strike Force . . .[and] we turn over every stone we can prior to closing on an asset to make sure there are no surprises once we close.*"[23]

67.    For instance, approximately two to three years ago, Defendants purchased *Summerdale Plaza Realty Fund LLC* ("*Summerdale Plaza*") for approximately <u>$35 Million</u>, and Defendants sold shares in that Underlying Property to Plaintiffs and other investors.    In marketing *Summerdale Plaza,* Defendants touted to Plaintiffs that the *Summerdale Plaza* investment was a stabilized, extremely-conservative investment that was virtually guaranteed to be resold for profit. Just today (February, 6, 2025), however, Plaintiffs were informed by Defendants that <u>Defendants sold *Summerdale Plaza* for approximately $15 Million</u> – **a <u>loss</u> to Plaintiffs and the other investors of $20 Million**, which is a *60% loss* on Plaintiffs' investments in *Summerdale Plaza*.[24]

---

[22] <u>See</u> <u>also</u> *Dr. McCann Article* (attached hereto as Exhibit 1)

[23] *https://fnrpusa.com/fnrp360/* (emphasis added).

[24] Plaintiffs will seek discovery in this case to determine how Defendants could possibly allow such a massive loss to occur on a purportedly stabilized, extremely-conservative investment.

68.    As such, Defendants either (a) fraudulently held out to Plaintiffs – at the time of Plaintiffs' investments – that Defendants had completed all of their due diligence respecting their purchase of the Underlying Properties (and that the Underlying Properties were in good, working order) or (b) fraudulently held out to Plaintiffs – after Plaintiffs' made their investments in the Defendant LLCs – that Defendants' construction company was required to charge the Underlying Properties and Plaintiffs millions of dollars to work on multiple, material improvements for the the Underlying Properties.[25]

69.    Defendants also conspired to misrepresent to Plaintiffs that the Underlying Properties would produce to Plaintiffs consistent, blended investment-returns of up to *9% annually*, because Defendants had purportedly acquired the Underlying Properties *with _fixed_-interest loans*.[26]

70.    In reality and unbeknownst to Plaintiffs, Defendants were able to make each Underlying Property *appear* like a profitable investment, because Defendants had actually and covertly financed the Underlying Properties with ***variable*** interest-rate loans. And when the market turned and interest rates rose, because Defendants deceived Plaintiffs and failed to leverage the Underlying Properties with the *_fixed_*-interest financing as agreed, the properties became significantly overvalued, and Plaintiffs were left with shares in companies that did not – *and could not* – produce proper distributions to Plaintiffs, or be sold for profit.[27]

---

[25]    See https://fnrpusa.com/fnrp360/ (video and website where Defendants claim they perform all of the due diligence required by them using their "Strike Force Team," before purchasing investment properties).

[26] See Exhibits 2-3.  These are the very reasons Plaintiffs invested their money with Defendants, as opposed to earning less FDIC-backed interest in a federal bank or credit union.

[27] As held out by Defendants, Plaintiffs were virtually guaranteed blended, annual investment-returns from the Defendant LLCs of over 9% (with the Underlying Properties to be resold for significant profit) because: (i) Defendants supposedly financed the Underlying Properties with fixed-rate loans; and (ii) the Underlying Properties allegedly required no significant, material improvements before they could be occupied for profit and sold in the near future, with a significant payout to Plaintiffs. See, e.g., Exhibit 2-3

71.    In order to further induce Plaintiffs to provide Plaintiffs additional, false security and to make additional investments in the Defendant LLCs, Defendants made additional, material misrepresentations to Plaintiffs in their conspiracy to fraudulently market and sell the Defendant LLCs and manage the Underlying LLCs.  For instance, Defendants repeatedly lied to Plaintiffs and falsely claimed that: (a) if Plaintiffs desired, they could each "cash out" of the Defendant LLC deals at any time; (b) salespersons of Defendants were in fact a managing principal of FNRP (with decision making power) when, in reality, that was false; and (c) the founders and the management of FNRP had bought shares for themselves in each and every one of the Defendant-LLC investments that Plaintiffs had bought shares in.  In reality, these statements by Defendants were patently false.[28]

72.    Plaintiffs were further lied to by Defendants and told that Plaintiffs would have access, any time they requested, to the documents and financials respecting the Underlying Properties, including the list of other investors. But when Plaintiffs requested these items, in order to cover-up Defendants' fraud, conspiracy, and material misrepresentations, Defendants made it their policy of refusing to provide to Plaintiffs any underlying documents (or the list of other investors), despite repeated demands by Plaintiffs.

73.    In turn, Defendants' intentionally failed to provide Plaintiffs with final copies of the Purchase Documents with reasonable time before Defendants required Plaintiffs to execute the Purchase Documents (so Plaintiffs' attorneys could not properly review the Purchase Documents and Plaintiffs were unaware of many contract terms and financial-numbers that Defendants added at the last minute. Defendants also calculatingly stalled their completion of the Purchase

---

[28] See Exhibit 4 (communication from Plaintiffs to Defendants requesting that Defendants cancel and return Plaintiffs' investments in the Defendants LLCs, and response from Defendants denying Plaintiffs' requests to cancel their investments).

Documents until just before Plaintiffs were required to file their 1031 property-exchange documents (which Plaintiffs had already designated with the IRS, so Plaintiffs were afraid to push back the date that Defendants required Plaintiffs to execute the Purchase Documents).

74.     These hard-nosed tactics by Defendants for immediate execution by Plaintiffs of the Purchase Documents allowed Defendants to fraudulently alter material-terms in the Purchase Documents without Plaintiffs' informed consent and which Plaintiffs were not aware of, including: (a) Defendants' fraudulent allocation to Plaintiffs with incorrect, <u>decreased fractional-ownership</u> in the Defendant LLCs; and (b) Defendants' wrongful imposition of <u>substantial acquisition-fees</u> to be paid by Plaintiffs to Defendants on every Defendant-LLC investment.  These illegal additions by Defendants to the Purchase Documents respecting the Defendant LLCs allowed Defendants to collect millions of dollars in fraudulent fees.[29]

75.     Defendants concealed their conspiracy and wrongful conduct from Plaintiffs, and kept Plaintiffs from being able to physically keep, review, or compare the literature, documents, and financials that Defendants used to present to Plaintiffs the terms concerning Plaintiffs' Defendant-LLC investments and Defendants' purchases of the Underlying Properties, by activating a computer program called "The Deal Room" – which serves to delete Defendants' literature, documents and financials related to the Defendant LLCs after a short period of time. This enabled Defendants to make fraudulent presentations to Plaintiffs regarding the Defendant-LLC investments, and then covertly "take back" all of the documents they produced in those presentations.[30]

---

[29]  The Purchase Documents were drafted by Defendants and consist of many thousands of pages..

[30] Plaintiffs will serve discovery requests and third-party subpoenas in this case for all documents that Defendants' kept or used at any time in The Deal Room.

76.    And when Plaintiffs complained to Defendants about the excessive management and other fees that Defendants were wrongfully collecting from Plaintiffs, Defendants executed separate agreements with Plaintiffs for reduced management fees, but Defendants then fraudulently failed to honor those separate agreements.[31]

77.    Moreover, to give Defendants unfettered ability to continue their scheme, Defendants unilaterally designated themselves as the asset manager for the Defendant LLCs (the "Asset Manager"), and also as the sole realtor respecting commercial-tenant deals in the Underlying Properties (the "Sole Realtor"). Then, Defendants conspired to fraudulently and secretly include provisions in the Purchase Documents that blocked Plaintiffs' right to remove Defendants from those posts. Thus, Defendants were able to continue their wrongful conspiracy and further defraud Plaintiffs and deplete the assets of the Defendant LLCs.[32]

78.    With Defendants now holding this self-imposed, "Golden Ticket" as the Asset Manager, the Sole Realtor, and Owner of the Defendant LLCs (a textbook conflict-of-interest), Defendants conspired to fraudulently manage the Underlying Properties, which enabled Defendants to wrongfully collect from Plaintiffs and the Defendant LLCs: (i) millions of dollars in fraudulent fees and other charges – disguised as payments for services to various Defendant-owned companies; and (ii) unreasonable, self-serving commissions and tenant-leasing fees and costs.[33]

---

[31] See, e.g., Exhibit 5.

[32] Pursuant to the provisions of the Purchase Documents, removal of Defendant FNRA as the Asset Manager requires unanimous consent of every Defendant LLC. To block Plaintiffs and the other investors from being able to accomplish this removal process, Defendants paid $1 to make themselves a voting LLC. With Defendants as a voting LLC, unanimous consent to remove Defendant FNRA as the Asset Manager of the Defendant LLCs became impossible for Plaintiffs.

[33] Plaintiffs believe that discovery will show considerable other ways that Defendants wrongly collected fees from the Defendant LLCs and conspired to defraud Plaintiffs, including Defendants setting up and using other related entities to wrongfully collect fees from the Underlying Properties and the Defendant LLCs.

79.    As the Sole Realtor, Defendants also conspired to wrongfully collect unreasonable, self-serving commissions and leasing fees regarding tenant-leasing deals. One egregious example of Defendants entering into a self-serving lease deal is the 2024 lease agreement between Defendant Maple Park Place LLC and tenant Five Below, which Defendants executed and from which Defendants earned substantial commissions and fees. The reported leasing costs were $1,071,380 for a lease agreement *valued only at $2,286,284 over 10 years* – which makes absolutely no business or logical sense.  And on top of that, Defendants took six-month longer than reasonable to complete the self-serving, Five Below deal.

80.    Moreover, Defendants breached the *Asset Management Agreement* that they were bound by as the Asset Manager of the Underlying Properties by: 1. making it their policy of refusing to provide to Plaintiffs any documents (or the list of other investors) related to the Underlying Properties, as required by the AMA;  2.  failing to send regular Reports, Budgets or Notifications for the Defendant LLCs and/or the Underlying Properties to Plaintiffs for review and/or approval, as required by the AMA; and 3. also failing to notify or gain approval from Plaintiffs for Defendants' material expenditures on the Underlying Properties outside those contemplated in the Defendant-LLC operating agreements,  as required by the AMA.

81.    Specifically, Defendants failed to:

- deliver to the tenants-in-common Annual Budgets and Operating Plans prior for the Defendant LLCs, which Defendants were required to deliver by the 15th of December each year;

- notify the tenants-in-common of any expenditures Defendants made respecting the Underlying Properties that were not with the budget;

- notify the tenants-in-common of material increases in costs

and expenditures respecting the Underlying Properties.

- notify the tenants-in-common of leasing expenditures and vacancies outside the Operating Plan respecting the Underlying Properties;

- notify the tenants-in-common of capital expenditures outside the Operating Plan respecting the Underlying Properties;

- bid out contracts and expenditures over a certain threshold amount respecting the Underlying Properties;

- deliver accounting documents for the Defendant LLCs for tax filing purposes within the scheduled deadline.

82.    To further cover-up Defendants' conspiracy to defraud Plaintiffs in this case, upon information and belief, Defendants also commingled funds and took unauthorized transfers to themselves and – because Defendants had conspired to fraudulently finance the Underlying Properties with *variable* rate loans (instead of *fixed*-rate financing, as agreed), and also because Defendants' conspired to skim money from the Underlying Properties , which depleted the assets of the Underlying Properties and caused the Underlying Properties to be undervalued[34] – Defendants concealed this and their other misconduct through their execution of a ponzi scheme to acquire debt and feign initial profits on the Underlying Properties.[35]

83.    Accordingly, Plaintiffs have repeatedly requested that Defendants cancel and return Plaintiffs' investments in the Defendants LLCs, but Defendants have refused Plaintiffs' requests.[36]

---

[34] See Dr. McCann Article at 3-4 (Chart of Defendants' Wrongful Cash-Distributions) (attached hereto as Exhibit 1, with the Curriculum Vitae of Dr. McCann ).

[35] Plaintiffs believe discovery in this case will help fill in any gaps that Defendants have hid from Plaintiffs regarding: the parameters of Defendants' Ponzi scheme; commingling of funds; unauthorized transfers; and fraudulent conspiracy to defraud Plaintiffs.

[36] See, e.g., Exhibit 4 (sample communication from Plaintiffs to Defendants requesting that Defendants cancel and return Plaintiffs' investments in the Defendants LLCs, and response from Defendants denying those requests).

**Plaintiffs' Investments in the Defendant LLCs**

84.    Plaintiff James May invested in the Defendant LLCs as listed here:

| | Investment Name | Ownership % | Commitment Amount |
|---|---|---|---|
| 1. | Brandywine Crossing Realty Fund LLC | 6.46% | $2,000,000.00 |
| 2. | McAlpin Square Realty Fund LLC | 10.77% | $1,000,000.00 |
| 3. | Sand Hill Plaza SC Realty Fund LLC | 8.61% | $1,000,000.00 |
| 4. | HV Center Realty Fund LLC | 6.11% | $600,000.00 |
| 5. | Village at Pitt Mills Realty Fund LLC | 3.47% | $500,000.00 |
| 6. | Crowe's Crossing Realty Fund LLC | 7.86% | $450,000.00 |
| 7. | Summerdale Plaza Realty Fund LLC | 4.18% | $390,000.00 |
| 8. | Southland Crossings Realty Fund LLC | 2.72% | $344,000.00 |
| 9. | SS Tulsa Center Realty Fund LLC | 4.02% | $300,000.00 |
| 10. | Westwood SC Realty Fund LLC | 1.68% | $280,000.00 |
| 11. | Champions Village Realty Fund LLC | 0.83% | $200,000.00 |
| | | **Total**: | **$7,064,000.00** |

85.    Plaintiff Anthony Musto[37] invested in the LLCs as listed here:

| | Investment Name | Ownership % | Commitment Amount |
|---|---|---|---|
| 1. | Champions Village Realty Fund LLC | 0.83% | $200,000.00 |
| 2. | HV Center TIC 1 Member Realty Fund LLC | 2.04% | $200,000.00 |
| 3. | Crowe's Crossing Realty Fund LLC | 6.99% | $400,000.00 |
| 4. | PC Center TIC 1 Member LLC | 11.04% | $1,000,000.00 |
| 5. | CS Center Realty Fund LLC | 0.57% | $100,000.00 |
| 6. | CK Center Realty Fund LLC | 0.55% | $100,000.00 |
| 7. | Tropicana Centre LV Realty Fund LLC | 0.25% | $100,000.00 |
| 8. | CTS Center TIC LLC | 11.61% | $1,000,000.00 |
| 9. | Summerdale Plaza Realty Fund LLC | 1.07% | $100,000.00 |
| | | **Total:** | **$3,200,000.00** |

86.    Plaintiff Jonathan Ciangiulli invested **$60,000.00** in the Summerdale Plaza Realty Fund LLC investment, with 1.1% Ownership.

87.    Plaintiff Abba Kader invested $400,000.00 in the McAlpin Square TIC 5 LLC (with 4.31% Ownership) investment, and the $400,000.00 in Tannehill TIC 5 LLC investment (with

---

[37] Anthony Musto purchased his shares in the Underlying LLCs under his own name and also using entities he owns, including: Anthony M Musto Grantor Retained Annuity Trust, TM Brooklyn Family Trust, TIC 1 LLC Piccadilly Associates LLC, and TIC 4 Member LLC Piccadilly Associates LLC.

2.04% Ownership), for a total investment of **$800,000.00**.

88.    Plaintiff Cory Tereick invested **$500,000.00** in the Maple Park SC TIC 12 Member LLC investment, with 3.35% Ownership.

89.    Plaintiff Patricia Thomas invested **$409,804.00** in the CTS Center TIC 1 LLC.

90.    Plaintiff Stanley Gruber invested $150,000.00 in the Bishops Corner SC Realty Fund LLC investment, and the $100,000.00 in Tropicana Center LV Realty Fund investment, for a total investment of **$250,000.00.**

## **CAUSES OF ACTION**

### COUNT I
### MAIL FRAUD AND WIRE FRAUD
*(A Pattern of Unlawful Activity Under 18 U.S.C. § 1961, et seq.)*

91.    The preceding paragraphs and allegations are incorporated by reference and re-alleged as if fully set forth at length herein.

92.    By engaging in the above-described open-ended actions and misrepresentations – which also was a consistent, regular, and dominant part of the manner in which the RICO Persons Anthony Grosso, Christopher Palermo, Michael Hazinski, Fred Battisti, Bill Comeau, Kurt Padavano, Andrew DeNardo, Jared Feldman, Andrea Boitnott, Sam Collier, Mike Law and Andrea White participated in and conducted the day-to-day business affairs of FNRP (RICO Enterprise) and FNRA (RICO Enterprise) (collectively, "the RICO Defendants") – the Defendants instigated, perpetrated, and executed a scheme to defraud Plaintiffs and numerous other of Defendants' telemarketing customers; to wit: the RICO Persons (Anthony Grosso, Christopher Palermo, Michael Hazinski, Fred Battisti, Bill Comeau, Kurt Padavano, Andrew DeNardo, and Jared Feldman), individually or in concert, and by or through representatives and employees of the RICO Enterprises (FNRP and FNRA), engaged in repeated and systematic

28

conspiracy to commit mail fraud and wire fraud (as described above), in violation of 18 U.S.C. §§ 1341; 1343, that generated multiple and repeated unlawful investments by Plaintiffs and numerous other of Defendants' telemarketing customers that, in turn, generated exorbitant compensation for Defendants.[38]

93.    The RICO Persons caused the RICO Enterprises to use the interstate mails and wires to repeatedly make and/or send fraudulent solicitations, sales receipts, and/or purchase confirmations to Plaintiffs and other telemarketing customers for the above-described transactions. As such, the RICO Persons conducted and/or participated in the business and financial affairs of the RICO Enterprises through a pattern of racketeering activity (i.e. repeated and systematic mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341; 1343), as described above, that generated multiple and repeated unlawful sales to Plaintiffs and numerous other of Defendants' telemarketing customers that, in turn, generated exorbitant compensation for them.

94.    The RICO Persons committed these substantive RICO offenses, all the while knowing about, and agreeing to, the overall objective of the fraud – generating exorbitant compensation for themselves. By their unlawful actions, therefore, they (i) conducted and/or participated in the affairs of FNRP and FNRA (in violation of 18 U.S.C. § 1962(c)) and/or (ii) conspired with others (the identities of whom are only known by Defendants at this stage in the litigation and are captioned "John Does 1-50") to violate 18 U.S.C. § 1962(b); (iii) and defrauded Plaintiffs and numerous other of Defendants' telemarketing customers in the process, in violation of 18 U.S.C.

---

[38] Upon information and belief, the RICO Defendants conducted their business and financial affairs through an open-ended and/or closed pattern of racketeering activity as set forth herein. At all relevant times, the RICO Defendants wrongful actions were committed willfully, maliciously, fraudulently, and with intent to injure and damage Plaintiffs, and with reckless disregard of their legal rights. The Defendants' relationship with Plaintiffs does not represent a one-off transaction but rather were representative of and were part and parcel of the RICO Defendants' normal pattern and scheme through which they have defrauded – and continue to defraud – other unsuspecting consumers out of millions of dollars.

§1962(d).[39]

95.    The multiple, repeated, and continuous acts of mail fraud and/or wire fraud described above, plus the active marketing and fraudulent sales to countless other victims over the course of numerous years, constitute a pattern of unlawful activity under 18 U.S.C. § 1961(1); (5). Nothing about the RICO Persons' schemes to defraud Plaintiffs and numerous other Defendants' telemarketing customers indicated that the scheme would ever terminate. Moreover, and independent of the duration of the scheme, their wrongful acts were and are a consistent, regular, and dominant part of the manner in which they participate in and conduct the day-to-day business and financial affairs of the RICO Enterprises, FNRP and FNRA.

## COUNT II
### VIOLATION OF 18 U.S.C. § 1962(c)

96.    The preceding paragraphs and allegations are incorporated by reference and re-alleged as if fully set forth at length herein.

97.    Defendants FNRP and FNRA are each an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c);

---

[39] Defendants maliciously conspired to defraud Plaintiffs, in violation of RICO, NYGBL § 349, and Securities and Exchange Commission ("SEC") Regulations by, amongst the plethora of reasons discussed below, and upon information and belief:

   (i) paying illegal commissions to their salespersons in violation of SEC Regulation D;
   (ii) overvaluing the Underlying Properties in order to fraudulently abscond with the difference from Plaintiffs' investments;
   (iii) making unauthorized transfers to themselves and commingled funds;
   (iv) executing of a ponzi scheme to pay Plaintiffs false "distributions" by acquiring debt and feigning initial profits on the Underlying Properties; and
   (v) fraudulently skimming from Plaintiffs more than half of the returns from the Underlying Properties by falsely holding out to Plaintiffs that Defendants were buying the Underlying Properties at below market prices – which was false.

See Dr. Craig McCann, SLCG Economic Consulting: First Realty Partners Reg D Offerings: Muppets Do Commercial Real Estate by Dr. at 3-4  ("Dr. McCann Article") (attached hereto as Exhibit 1, with the *Curriculum Vitae* of Dr. McCann ) ("FNRP is not buying these properties at below market prices as it claims. FNRP buys a property at or above market and shaves more than half of the returns for itself.") Contra RICO FNRP's Marketing and Sales Materials, https://fnrpusa.com/fnrp360/ (FNRP video where Defendants falsely state that Defendants "secure properties both on-market and off-market, at or below market value . . . ).

1962(d).

98.    Anthony Grosso, Christopher Palermo, Michael Hazinski, Fred Battisti, Bill Comeau, Kurt Padavano, Andrew DeNardo, Jared Feldman, Andrea Boitnott, Sam Collier, Mike Law and Andrea White are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); 1962(d).

99.    Anthony Grosso, Christopher Palermo, Michael Hazinski, Fred Battisti, Bill Comeau, Kurt Padavano, Andrew DeNardo, Jared Feldman, Andrea Boitnott, Sam Collier, Mike Law and Andrea White conducted and/or participated in the business and financial affairs of FNRP (RICO Enterprise) and FNRA (RICO Enterprise) through patterns of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B); 1961(5); 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

100.    The patterns of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) (*see* ¶¶ 15-36, *supra*) by Anthony Grosso, Christopher Palermo, Michael Hazinski, Fred Battisti, Bill Comeau, Kurt Padavano, Andrew DeNardo, Jared Feldman, Andrea Boitnott, Sam Collier, Mike Law and Andrea White proximately and/or directly caused Plaintiffs to suffer injury within the meaning of 18 U.S.C. § 1964(c); to wit, Plaintiffs was damaged by, inter alia, the fraudulent representations made by Defendants and the corresponding mental anguish they suffer. Anthony Grosso, Christopher Palermo, Michael Hazinski, Fred Battisti, Bill Comeau, Kurt Padavano, Andrew DeNardo, Jared Feldman, Andrea Boitnott, Sam Collier, Mike Law and Andrea White committed these substantive RICO offenses by using FNRP and/or FNRA to engage in multiple predicate acts of mail fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the mail fraud – generating exorbitant compensation for themselves. They

knew their tactics and marketing practices were misleading and unlawful and would cause Plaintiffs and numerous other Defendants' telemarketing customers to suffer damages that were reasonably foreseeable by them and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

COUNT III
VIOLATION of 18 U.S.C. § 1962(d) by
CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(c)

101.    The preceding paragraphs and allegations are incorporated by reference and re-alleged as if fully set forth at length herein.

102.    FNRP and FNRA are each an "enterprise" engaged in, and the activities of which affected, interstate commerce within the meaning of 18 U.S.C. §§ 1961(4); 1962(c); 1962(d). Anthony Grosso, Christopher Palermo, Michael Hazinski, Fred Battisti, Bill Comeau, Kurt Padavano, Andrew DeNardo, Jared Feldman, Andrea Boitnott, Sam Collier, Mike Law and Andrea White are "persons" within the meaning of 18 U.S.C. §§ 1961(3); 1962(c); and 1962(d).

103.    Anthony Grosso, Christopher Palermo, Michael Hazinski, Fred Battisti, Bill Comeau, Kurt Padavano, Andrew DeNardo, Jared Feldman, Andrea Boitnott, Sam Collier, Mike Law and Andrea White conspired with other persons (the identities of whom are only known by Defendants at this stage in the litigation and are captioned John Does 1-50) within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is, they conspired to conduct and/or participate in the business and financial affairs of FNRP (RICO Enterprise) and FNRA (RICO Enterprise) through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(c); 1961(5); and 1962(c); to wit, the multiple, repeated and continuous acts of mail fraud and wire fraud, in violation of 18 U.S.C. §§ 1341; 1343, set forth above.

104.    The RICO Persons' pattern of unlawful activity and corresponding violations of 18 U.S.C.

§ 1962(d) were the causes-in-fact and proximate cause of Plaintiff's suffering injury to his

business and/or property within the meaning of 18 U.S.C. § 1964(c); to wit: Plaintiffs was

damaged by, inter alia, the fraudulent representations made by the Defendant. The RICO Persons,

themselves and through their representatives agreed to commit these substantive RICO offenses

by using the RICO Enterprises (FNRP and/or FNRA) to engage in multiple predicate acts of mail

fraud and wire fraud, all the while knowing about, and agreeing to, the overall objective of the

mail fraud – generating exorbitant compensation for themselves. They knew their tactics and

marketing practices were misleading and unlawful and would cause Plaintiffs and numerous other

Defendants' telemarketing customers to suffer damages that were reasonably foreseeable by them

and/or anticipated as a substantial factor and a natural consequence of their patterns of unlawful

activity.

COUNT IV
FRAUDULENT  INDUCEMENT

105.    The preceding paragraphs and allegations are incorporated by reference and realigned as if

set out at length herein.

106.    Defendants, by and through the FNRP telemarketing salespersons and representatives,

utilized one or more of the above-described unlawful, false, misleading, and unconscionable sales

tactics to fraudulently induce Plaintiffs into the purchases of the investments in the Defendant

LLCs. Specifically, Defendants, through their employees and representatives, intentionally and

fraudulently induced Plaintiffs by misrepresenting (and omitting) material facts prior to and after

Defendants investments, which Defendants knew were false at the time they were made with the

intent to induce Plaintiffs to invest in the Defendant LLCs, including, amongst other falsehoods

33

described above, that: (a) the underlying real estate purchased by each Defendant LLC had been secured with fixed-interest loans; (b) Defendants' high valuations of the underlying properties were correct and the Defendant LLCs would thus generate continued revenue-streams for Plaintiffs; (c) Plaintiffs were "preferred" customers, which guaranteed to Plaintiffs a blended, annual investment-return from the Defendant LLCs of more than 9%; (d) the underlying properties required no material improvements before they could be occupied for profit and resold by Defendants (which would have provided Plaintiffs with a lump sum payment); (e) Plaintiffs were able to "cash out" of the Defendant-LLC investments at any time; (f) Plaintiffs would have access to all of the underlying documents for each deal that they invested in; and (g) Defendants completed all of their due diligence respecting their purchase of the underlying Defendant-LLC properties (and that the underlying properties were in good, working order).[40]

107.    Had Plaintiffs known about Defendants' conspiracy to fraudulently misrepresent and omit material information related to their Defendant-LLC investments, described herein, Plaintiffs never would have invested in the Defendant LLCs or entered into any agreements with Defendants, and as such would not be governed by any provisions in those agreements.

108.    In fact, Defendants, by and through the FNRP telemarketing salespersons, *continued* their fraudulent conspiracy to induce Plaintiffs even after Plaintiffs' original purchases by providing a "double whammy" of false promises to Plaintiffs: Defendants first prepared false and misleading sales, marketing, and other data, and then Defendants' telemarketing salespersons used one or more of the unconscionable sales tactics described herein to make "follow up" calls to Plaintiffs

---

[40] See, e.g., https://fnrpusa.com/fnrp360/; Exhibit 2 (examples of correspondence between FNRP-representatives and Plaintiffs guaranteeing 9% "preferred customer" annual, blended investment-return); Exhibit 3 (screenshots of financials – prepared by Defendants' representatives – where Defendants use *fixed interest-rates* to provide Defendants with valuations of the underlying Defendant-LLC properties); Exhibit 4 (communication from Plaintiffs to Defendants requesting that Defendants cancel and return Plaintiffs' investments in the Defendant LLCs and Defendants' response denying Plaintiffs' requests).

with additional false information and misrepresentations about their own fraudulent data, in order to entice Plaintiffs into signing agreements and continuing to invest in additional shares of the Defendant LLCs (each time making the next Defendant-LLC investment seem more grand and profitable).

109.    Defendants made the misrepresentations, described herein, with full knowledge that such representations were false when made with the intent to induce Plaintiffs to purchase the investments in the Defendant LLCs, to Plaintiffs' financial detriment and Defendants' financial gain. As a direct and/or proximate result of Defendants' false and misleading representations (and material omissions) about the investments in the Defendant LLCs, Plaintiff suffered (and continue to suffer) damages in the form of, inter alia, the amounts paid to Defendants for investments in the Defendant LLCs and mental anguish damages.

110.    Defendants, by and through the FNRP telemarketing salespersons and representatives, committed the tort of fraudulent inducement in their verbal and telephonic sales pitches to Plaintiffs through the falsehoods, half-truths, and omissions. Moreover, Defendants' false representations and/or omissions were made knowingly and intentionally or, at the very least, in reckless disregard of Plaintiffs rights and interests.

111.    Plaintiffs justifiably relied upon Defendants' material misrepresentations. Absent those falsehoods, Plaintiffs would never have entered into any agreements with Defendants to purchase the investments in the Defendant LLCs (and Plaintiffs would not be governed by any of the provisions of those agreements). Accordingly, Defendants' wrongful actions constitute fraudulent inducement under New York law.

## COUNT V
## FRAUD AND/OR FRAUDULENT CONCEALMENT

112.    The preceding paragraphs and allegations are incorporated by reference and realigned as if set out at length herein.

113.    Defendants defrauded Plaintiffs pursuant to common law. In order to sell the shares of Defendant LLC's to Plaintiffs, Defendants conspired to utilize one or more of the above-described unlawful, false, misleading and unconscionable high-pressure sales tactics. Specifically, Defendants and their telemarketer employees and representatives falsely and/or misleadingly represented to Plaintiffs, amongst the plethora of falsehoods described above, that: (a) the underlying real estate purchased by each Defendant LLC had been secured with fixed-interest loans; (b) Defendants' high valuations of the underlying properties were correct and the Defendant LLCs would thus generate continued revenue-streams for Plaintiffs; (c) Plaintiffs were "preferred" customers and Defendants guaranteed to Plaintiffs a blended investment return on the Defendant LLCs of more than 9% annually; (d) the underlying properties were claimed by Defendants to require no material improvements before they could be occupied for profit and sold by Defendants, which would have provided Plaintiffs with a lump sum payment; (e) Plaintiffs would have access to all of the underlying documents for each deal that they invested in; (f) if Plaintiffs desired, they could each "cash out" of the Defendant LLC deals at any time; and (g) Defendants completed all of their due diligence respecting their purchase of the underlying Defendant-LLC properties (and that the underlying properties were in good, working order).[41]

114.    As such, Defendants are liable for fraudulent concealment against Plaintiff.[42] Defendants

---

[41] Id.

[42] The elements of fraudulent concealment are identical to the elements for fraud with the addition that the defendant must have a duty to disclose material information and failed to do so, as in the instant case.

had a duty to disclose to Plaintiff based upon their contractual relationship. In addition, or else in the alternative, Defendants had a duty to disclose to Plaintiff based upon the "special facts" doctrine, which provides that a duty to disclose arises when one party's superior knowledge of essential facts renders a transaction without disclosure inherently unfair. The "special facts" doctrine is applicable to the present case because the withheld and hidden material information as to the investments in the Defendant LLC's at issue was "peculiarly within the knowledge" of Defendants and that the information was not such that could have been discovered by Plaintiff through the exercise of ordinary intelligence.

115.  Defendants, by and through their employees and representatives, made the herein-detailed false representations (and material omissions) to Plaintiffs with the intent that Plaintiffs relied upon them and with full knowledge that such representations were false when made. Plaintiffs relied on Defendants' material and false representations when deciding to invest in the Defendant LLC's. In fact, they purchased shares in the Defendant LLC to their financial detriment and Defendants' financial gain. As a direct and/or proximate result of Defendants' false and misleading representations to Plaintiffs (and material omissions) concerning Plaintiffs' investments in the Defendant LLCs, Plaintiffs suffered (and continue to suffer) damages in the form of, inter alia, the amounts paid in fees and commissions to Defendants, as well as consequential damages related to the lost profits, and other statutory damages.

116.  By virtue of the confidential business relationship between Plaintiff and Defendants, Defendants had a duty to disclose the above concealed material facts to Plaintiff. Their deliberate silence, when they had a duty to speak, and the resulting nondisclosure of the above concealed material facts, is the equivalent of false representations and/or omissions. Such false representations and/or omissions were made knowingly and intentionally or, at the very least, in

37

reckless disregard of Plaintiff's rights and interests.

117.    Plaintiffs justifiably relied on Defendants' false representations and/or omissions to their financial detriment by investing in the Defendant LLCs. Defendants' wrongful actions constitute fraud at common law and a conspiracy to defraud under RICO.

118.    Defendants concealed their wrongful actions with the intent to mislead and defraud Plaintiffs.  Plaintiffs were not aware of, nor, through the exercise of due diligence, could have become aware of Defendants' wrongful actions until such wrongful actions brought to light by third parties. Due to the Parties' confidential business relationships, which were predicated on their mutual trust and confidence, and Defendants' superior knowledge and/or means of knowledge, Defendants had a duty to disclose to Plaintiffs the above materially false and omitted information. Defendants' failure to do so constitutes fraudulent concealment under law.

COUNT VI
NEGLIGENT  MISREPRESENTATION

119.    The preceding factual statements and allegations are incorporated by reference and related as if set out at length herein.

120.    Defendants made certain representations (and material omissions) to Plaintiffs in the course of their business and in transactions in which Defendants had a substantial monetary interest. Defendants negligently supplied false information that guided Plaintiffs to make investments in the Defendant LLCs.

121.    Defendants failed to exercise reasonable care and competence in obtaining, confirming the accuracy of, and communicating such information to Plaintiffs by, inter alia, utilizing one or more of the herein-described unlawful, false, misleading and unconscionable sales tactics typical of the

direct sales industry and/or making the above-described false and material misrepresentations and omissions.

122.    Plaintiffs justifiably relied on Defendants' negligent misrepresentations when investing in the Defendant LLCs, which directly and/or proximately caused them each to suffer damages to the financial benefit of Defendants. Plaintiffs continued to justifiably rely upon Defendants' negligent misrepresentations in their oral telephonic representations and various presentations and print advertisements regarding investment in the Defendant LLCs, which directly and/or proximately caused them to suffer ruinous damages to the financial benefit of Defendants. Defendants' wrongful conduct constitutes negligent misrepresentation under New York common law.

COUNT VII
VIOLATIONS OF NYGBL § 349

123.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

124.    NYGBL § 349 declares unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state."

125.    NYGBL § 349(h)  includes the right of an injured party to bring a private right of action, and states that a Plaintiff may bring an action under NYGBL § 349 and the Court may also enjoin a defendants' unlawful act of practice, and the statute computes damages to be the the greater of actual damages or $50, and at the Court's discretion where a defendant's conduct is willful or knowingly (like here), **three times the amount of the actual damages**:

> any person who has been injured by reason of any violation
> of this section may bring an action in his own name to
> enjoin such unlawful act or practice, an action to recover

39

> his actual damages or fifty dollars, whichever is greater, or
> both such actions. *The court may, in its discretion, increase*
> *the award of damages to an amount not to exceed three*
> *times the actual damages up to one thousand dollars, if the*
> *court finds the defendant willfully or knowingly violated*
> *this section.* The court may award reasonable attorney's fees
> to a prevailing plaintiff (emphasis added).[43]

126.  At all relevant times, Defendants have conducted their business, trade and commerce and furnished services in New York within the meaning of NYGBL § 349; specifically, Defendants' marketing and sales to Plaintiffs of shares in the Defendant LLCs, as detailed herein.

127.  From the start, Defendants' conspiracy to defraud Plaintiffs with respect to their investments in the Defendant LLCs permeated every aspect of Defendants' interactions and business dealings with Plaintiffs, and included Defendants: (a) fraudulent inducements to cause Plaintiffs to invest in the Defendant LLCs; (b) fraudulent preparation and handling of Plaintiffs' investments and the Purchase Documents; and (c) fraudulent mismanagement of the Defendant-LLC investments and Underlying Properties. These are additional willful and unlawful acts and deceptive trade practices by Defendants in violation of NYGBL § 349

128.  Defendants additionally disclosed materially misleading and false information in their sales of shares of Defendant LLCs to Plaintiffs, which was a willful, unlawful act and deceptive trade practice by Defendants in violation of NYGBL § 349, including Defendants false and misleading statements to Plaintiffs that: (a) the underlying real estate purchased by each Defendant LLC had been secured with fixed-interest loans; (b) Defendants' high valuations of the underlying properties were correct and the Defendant LLCs would thus generate continued revenue-streams for Plaintiffs; (c) Plaintiffs were "preferred" customers, which guaranteed to

---

[43]  NYGBL § 349 states that this section shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this state, and shall not supersede, amend or repeal any other law of this state under which the attorney general is authorized to take any action or conduct any inquiry.

Plaintiffs a blended, annual investment-return from the Defendant LLCs of more than 9%; (d) the underlying properties required no material improvements before they could be occupied for profit and resold by Defendants (which would have provided Plaintiffs with a lump sum payment); (e) Plaintiffs were able to "cash out" of the Defendant-LLC investments at any time; (f) Plaintiffs would have access to all of the underlying documents for each deal that they invested in; and (g) Defendants completed all of their due diligence respecting their purchase of the underlying Defendant-LLC properties (and that the underlying properties were in good, working order).[44]

129.    Further, as set forth above, Defendants omitted material information in their sale and marketing of the Defendant LLCs to Plaintiffs, which was an act likely to mislead a plaintiff acting reasonably under the circumstances, and constitutes an additional willful, deceptive and unlawful trade practice by Defendants in violation of NYGBL § 349.

130.    Defendants further conspired to defraud Plaintiffs by forming a construction arm of their business (under the guise of being separate from Defendants), where Defendants' wrongfully earned millions of dollars by charging the Defendant LLCs for construction-work and material improvements supposedly needed to the underlying Defendant-LLC properties.  Such misconduct by Defendants is an additional violation of NYGBL § 349.

131.    Defendants also violated NYGBL § 349 by maliciously conspiring to defraud Plaintiffs by, amongst the plethora of reasons discussed herein, and upon information and belief:

    (i) **paying illegal commissions to their salespersons** in violation of SEC
        Regulation D;[45]

    (ii) **overvaluing the Underlying Properties** in order to fraudulently

---

[44] See FN 41, supra.

[45] Defendants violated SEC Reg D  by selling private placement securities without a broker-dealer license while paying Defendants' employees, owners and partners *transaction-based compensation*, and later again violating SEC Reg D by paying Defendants' employees, owners and partners *transaction-based compensation*, under the guise of a bonus pool.

abscond with the difference in price between the amount that Plaintiffs invested in each Underlying Property and the lesser price Defendants actually paid for each Underlying Property;

(iii) **making unauthorized transfers** to themselves and **commingled funds**;

(iv) **executing of a ponzi scheme** to pay Plaintiffs false "distributions" by acquiring debt and feigning initial profits on the Underlying Properties; and

(v) **fraudulently skimming from Plaintiffs <u>more than half</u> of the returns from the Underlying Properties** by falsely holding out to Plaintiffs that Defendants were buying the Underlying Properties at below market prices – which was false.

<u>See</u> Dr. McCann Article at 3-4 (attached hereto as Exhibit 1, with the *Curriculum Vitae* of Dr. McCann) (showing an example Defendants scheme and Cash Distributions Chart concerning Defendants' purchase of and financial accounting for Defendant LLC –*Maple Park SC Realty Fund LLC* ("Maple Park") – and concluding that "FNRP is not buying these properties at below market prices as it claims. FNRP buys a property at or above market and shaves more than half of the returns for itself.") <u>Contra</u> RICO *FNRP's Marketing and Sales Materials*, https://fnrpusa.com/fnrp360/ (FNRP video where Defendants falsely state that Defendants "secure properties both on-market and off-market, at or below market value . . . ).

132.   Defendants' willful and unlawful deceptive acts against Plaintiffs in violation of NYGBL § 349, as set forth herein, directly and proximately caused injury to Plaintiffs in the amount of at least $12,033,804.00

133.   Defendants' deceptive, unlawful, abusive, and fraudulent misconduct in this case, methods of solicitation, and conspiracy to misrepresentation material facts with respect to Defendants' marketing and sales to Plaintiffs of shares in the Defendant LLCs, and Defendants' other fraudulent, unlawful, and willful misconduct described herein, including Defendants' secret

formation of a construction arm of their business and other related entities and falsely earning millions of dollars for unnecessary work on the underlying Defendant LLC properties, also constitute unlawful and unconscionable commercial practices in violation of NYGBL § 349 and the other laws referenced herein.  Each separate instance of fraudulent conduct by Defendants, every sale and unreasonable commission collected, and all other misrepresentations by Defendants in this case, constitute a separate violation under NYGBL § 349, subjecting Defendants to separate penalties and violations for each instance of misconduct.

134.    In addition, Defendants' conspiracy to defraud Plaintiffs in this matter violated NYGBL § 349 because, as detailed herein, Defendants' misconduct in this case also violated other statutes and laws, including RICO and SEC Regulations, which is also violation of NYGBL § 349.

## COUNT VIII
## NEGLIGENCE

135.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

136.    Defendants negligently valued, promoted, marketed, advertised, and sold investments to Plaintiffs in the Defendant LLCs. This violated and breached Defendants' duty to Plaintiffs to exercise reasonable care in valuing, promoting, marketing, advertising, and selling the investments to Plaintiffs. Defendants' wrongful conduct directly and/or proximately caused Plaintiffs to suffer damages.  Defendants' wrongful conduct constitutes negligence at common law.

## COUNT IX
## CONSPIRACY

137.    The preceding factual statements and allegations are incorporated by reference and

realigned as if set out at length.

138.    Defendants (and possibly others, i.e., "John Does 1-50"), either working together as a combined group or in sub-combinations of two or more, affirmatively conspired to engage in the wrongful actions set forth above. By doing so, Defendants conspired to accomplish an unlawful purpose or a lawful purpose by an unlawful means. As such, Defendants conspired to commit the wrongful actions outlined above, all of which directly and proximately caused Plaintiffs to sustain actual and consequential damages. Defendants' wrongful actions constitute civil conspiracy at common law.

COUNT X
UNJUST ENRICHMENT

139.    The preceding factual statements and allegations are incorporated by reference and realleged as if set out at length

140.    A measurable benefit has been conferred on Defendants under such circumstances that Defendants' retention of the benefit without payment to Plaintiffs would be unjust.

141.    The benefit is the taking of Plaintiffs' money under false pretenses and not providing Plaintiffs with the revenue stream and increased investment-value, which Plaintiffs were supposed to receive for Plaintiffs' investments in the Defendant LLCs.

142.    Defendants' employees and representatives have been unjustly enriched by: (i) being paid fees for investments in the Defendant LLCs; (ii) taking salaries for working for the Defendant LLCs; (iii) receiving unreasonable commissions related to the tenant leases in the Defendant LLCs; (iv) unjustly receiving fees through related entities; and (v) taking a share of the profits of the Defendant LLCs. Accordingly, Plaintiffs seek to impose a constructive trust over (and

recover) all amounts by which Defendants have been unjustly enriched.

143.    The benefit is measurable because Defendants' have in their possession detailed records concerning their sales of shares to Plaintiffs in the Defendant LLCs, including monies Defendants earned.

COUNT XI
ALTER-EGO

144.    Alter-ego liability is established upon a showing that a defendant has complete domination of a corporation in respect to the transaction at issue and that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury. Because a decision to pierce the corporate veil will necessarily depend on the attendant facts and equities of the case at issue, there are no definitive rules governing the circumstances when this power Plaintiffs be exercised.

145.    Based upon information and belief, RICO Persons Anthony Grosso and Christopher Palermo, individually and collectively, used the corporate form as an alter-ego and as mere tools or business conduits. They completely dominated Defendant FNRP and Defendant FNRA to shield assets and thus cause a diminution of available resources from which Plaintiffs may satisfy the damages, directly and/or proximately caused by Defendants' wrongful conduct. Upon information and belief, there are a plethora of undocumented funds-transfers – and an unclear allocation of profit and losses – between Defendant FNRP, Defendant FNRA, RICO Person Anthony Grosso and RICO Person Christopher Palermo.[46]

146.    Upon information and belief, Defendants also commingled funds and took unauthorized transfers to and from themselves and Defendants FNRP and Defendant FNRA. In short,

---

[46] See Dr. McCann Article at 3-4 (attached hereto as Exhibit 1, with the Curriculum Vitae of Dr. McCann) (showing an example Defendants scheme and Cash Distributions Chart),

Defendant FNRP and Defendant FNRA is substantially one and the same with Anthony Grosso and Christopher Palermo, and the relationship between them is an illegitimate use of the corporate form.

COUNT XII<br>RESPONDEAT SUPERIOR

147.    The preceding factual statements and allegations are incorporated by reference and realigned as if set out at length.

148.    Defendants, including but not limited to, Defendant Anthony Grosso, Christopher Palermo, Michael Hazinski, Fred Battisti, Bill Comeau, Kurt Padavano, Andrew DeNardo, Jared Feldman, Andrea Boitnott, Sam Collier, Mike Law and Andrea White are also liable for the above wrongful acts committed by their employees during the course and scope of their employment by the Defendants; to wit, the employees' and representatives' wrongful conduct was committed (i) within their general authority, (ii) in furtherance of Defendants' business, and (iii) to accomplish the objective for which the employees/representatives were hired (*i.e.*, selling investments in the Defendant LLCs to customers like Plaintiffs)— all of which directly and/or proximately caused Plaintiffs to suffer damages to the financial benefit of Defendants—and for which Defendants are liable under the doctrine of *respondeat superior*.

**RELIEF REQUESTED**

149.    RECISSION. Based on Defendants' above-described wrongful conduct, Plaintiffs are entitled to full recission of the Defendant-LLC transactions at issue by which Defendants conspired to fraudulently market and sell to Plaintiffs investments in the Defendant LLCs. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

150.    ACTUAL AND CONSEQUENTIAL DAMAGES. As direct and proximate result of

Defendants' wrongful conduct and illegal conspiracy, Plaintiffs have suffered (and continue to suffer) damages in the form of, inter alia, the amounts paid to Defendants for the investments in the Defendant LLCs. Plaintiffs are entitled to recover consequential damages related to lost investments when they were lured into purchasing the investments in the Defendant LLCs and the mental anguish they have suffered in connection with these transactions— in an amount to be determined by the trier of fact. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

151.    AUTOMATIC TREBLE DAMAGES UNDER 18 U.S.C. § 1964(c).  Plaintiffs are also entitled to automatic treble damages under 18 U.S.C. § 1964(c) for Defendants' knowing, willful and intentional wrongful conduct in violation of the RICO statute. All conditions precedent to Plaintiffs' claims for relief have been performed and/or occurred.

152.    TRIPLE ACTUAL-DAMAGES UNDER NYGBL § 349.  Plaintiffs are also entitled to statutory penalties of triple actual-damages for Defendants' willful, unlawful, deceptive, and fraudulent misconduct described herein with respect to Defendants' marketing and sales to Plaintiffs of shares in the Defendant LLCs, and fraudulent mismanagement of the Defendant LLCs and the Underlying Properties.

153.    EXEMPLARY DAMAGES. Defendants' wrongful and unlawful conspiracy to defraud Plaintiffs was actions was committed intentionally, willfully, with malice and/or with conscious and/or reckless disregard for Plaintiffs' rights and interests. Accordingly, Plaintiffs are also entitled to an award of punitive damages against Defendants, both as punishment and to discourage such wrongful conduct in the future.

154.    ATTORNEYS' FEES, LITIGATION EXPENSES AND COSTS. Plaintiffs  are also

entitled to recover their reasonable and necessary attorneys' fees, litigation expenses and court costs, to be determined by the trier of fact.

155.    **TRIAL BY JURY.**  Plaintiff requests trial by a jury of all legal claims herein.

WHEREFORE, Plaintiffs request judgment in their favor and against the Defendants, jointly and severally, awarding compensatory damages for all actual and consequential losses in an amount to be determined by the Court but equaling or exceeding TWELVE MILLION, TWO HUNDRED AND EIGHTY THREE THOUSAND, AND EIGHT HUNDRED AND FOUR DOLLARS ($ **$12,283,804.00**); treble damages under 18 U.S.C. § 1964(c); statutory triple actual-damages penalties under NYGBL § 349; exemplary and punitive damages; and all amounts by which Defendants have been unjustly enriched; directing an equitable accounting for all benefits, consideration, and profits received, directly or indirectly, by Defendants, including the imposition of a constructive trust and the voiding of unlawful transfers; enjoining Defendants' unlawful and deceptive conduct pursuant to NYGBL § 349; and awarding attorneys' fees and litigation expenses pursuant to 18 U.S.C. § 1964(c) and NYGBL § 349, and the costs of suit pursuant to 28 U.S.C. § 1920 and Fed. R. Civ. P. 54(d); together with pre-judgment interest pursuant to the highest legal rate, and such other and further relief as the Court deems just, proper, and equitable.

Dated: February 11, 2025

Respectfully submitted,

**SECURITIES ARBITRATION LAW GROUP**

/s/ Mack Press
By: Mack Press (NY Bar: 2885424)
    1200 G St NW SUITE 800
    Washington, DC 20005
    (202) 444-4222
    mack@arbitrationlawgroup.com

48